Mr. Bernard, would you like to save some time for rebuttal, sir? Yes, your honor. I'd like to reserve five minutes. Five minutes it is. The clock is set and we are ready. Go ahead, sir. May it please the court, Arnold Bernard on behalf of the appellant, Kenneth Douglas. Per the direction of this honorable court, there are two primary issues we've been asked to address today, both involving sentencing enhancements. And it's the same standard of review that would be applied to each of those enhancements. It's a two-part review process. First, this court reviews for procedural error, and if it passes muster, then it reviews for substantive reasonableness. I would submit to this court that as to both of those sentencing enhancements, procedural error has occurred. Let's drill down a little bit to what's the standard of review first with respect to the obstruction of justice enhancement. With respect to the obstruction of justice, the standard of review requires that this court determine whether or not the record supports the enhancement for clear error. It's a factual determination. So clear error for a factual determination? Yes, yes. However, in doing so and looking at the two cases that this court asked us to address today, the factual determination that's to be made by the district court in making that determination, the burden of proof is on the government, as the government is the party which seeks the enhancement. All right. So with regard to the obstruction of justice, your position is it's clear error and it should be reversed because the court relied only on the medical or in its judgment the ambiguity of the medical records and found that there was a failure. But there was no finding of willfulness on the record, right? That's correct, Your Honor. Yes. And the medical records that were handed up included records that spanned about 15 hours, Mr. Douglas, being seen by different medical professionals? My understanding, Your Honor, at that rule-of-show cause hearing, what was presented was described as a medical verification. And my understanding is that document only indicated that the appellant entered the hospital at approximately 2.18 a.m. the day that was set for jury selection, was treated in the emergency room, and was then transferred to another facility and continued to be monitored to undergo some tests and receive care. Now, the extent of the ailment that he was experiencing, my understanding is that's not described in that document. There's no specific diagnosis. The only thing that's in there are the complaints made by the appellant. So there's the results of an EKG? I don't know. I don't know if that is in there or not because we don't have that document. I've scoured the case file that was transferred to me by Mr. Douglas' prior counsel. The medical verification that was provided to the court was not made part of the record as an exhibit. And in discussing this case with the U.S. Attorney's Office, it's my understanding that they have no document either. So there was a show-cause hearing that was conducted immediately after his failure to appear on the date of jury selection. Yes. And also there was a request for a continuance of the trial at that time. That's correct.  Yes, Your Honor. Doesn't it seem like it was all kind of orchestrated to move things beyond the original date of the jury selection? First he doesn't show and then you get a request from defense counsel to continue the trial? Well, defense counsel's request, by my reading of the record, and, again, I wasn't trial counsel on this matter, but my understanding is that defense counsel's request was more related to requiring additional time to prepare, to interview witnesses, have his investigators go out and conduct investigations, things of that nature. You had 100 jurors show up for jury selection, and I can understand why a district judge would be frustrated. Yes. Was there any communication from the defendant, from Mr. Douglas himself, to let everybody know he was in the hospital? He, I believe, contacted, well, actually I don't know. I don't know the answer to that. I noticed in the record there was a statement by defense counsel that he was shocked that Mr. Douglas wasn't there. So it seemed to me, at least inferentially, that Mr. Douglas didn't contact his own lawyer to say he hadn't been in the hospital. Right. That's my reading of it as well. Former counsel's passed away, right? I'm sorry? Former counsel's passed away. That's correct. That's correct. So we don't have him available to ask what was going on at that time, unfortunately. With respect to this issue of willfulness and whether the district court made a specific finding, if we look at the Bail Reform Act and we look at what it takes to revoke someone's bail, doesn't the district court have to find, by clear and convincing evidence, that there's been a violation of a condition of release and by implication, if the judge held and revoked, that it made such a finding that there was a willful violation of the conditions by not appearing? I don't know if that revocation was with regard to the failure to appear or whether it was with regard to a future risk of flight, because that seemed to be the concern as well that the government had raised at a previous point, and then this failure to appear, this non-appearance may have solidified that with the trial court. So, again, I think the record is a little ambiguous as to on what basis the bond was revoked. I'm not sure that's right, because when the government on a prior occasion tried to seek revocation, the district court reviewed the government's entreaty, right, because the government had said that Douglas apparently had tried to get a ticket to book his way out of town. It turned out that that was by mistake. He canceled it immediately and booked it for his wife, and then his wife didn't take the flight, and then the court said, no, no, no, no, and reviewed the government's entreaty to revoke his bail. Well, the court was unable to find by clear and convincing evidence that that action constituted a violation of his bail conditions. However, at the show-cause hearing, the court does reference that instance again, just prior to revoking the bond. And help me, because four days later, he reinstates bail. Exactly. So whatever inference I suppose we could draw with regard to the 10th seems to be undermined by the revocation, I'm sorry, by the reinstatement of bail on the 14th. Yes, that was my position. I believe I articulated that in my brief as well, that the judge's willingness to reinstate bond with the added condition of electronic monitoring tends to chip away at this apparent belief that the appellant was a risk of flight. If that was a belief that the court had or a concern, then surely the bond would have been revoked and the defendant would have remained incarcerated until jury selection or non-jury trial. We used up a lot of your time on the obstruction of justice enhancement. What about the abuse of position of trust enhancement, and what's our standard of review with respect to that enhancement? Well, it's a two-part standard of review. First, this honorable court must look and determine whether or not the position held by the appellant did constitute a position of trust, and that's a legal question. Therefore, the standard of review is de novo. Secondly, after that step is completed, this court reviews for an abuse of discretion as to whether or not the appellant abused that position of trust, and that's a factual question. So it's reviewed for clear error. The test for determining whether or not a position constitutes a position of trust is a three-part process. Do you think he satisfies any of the Pardo factors? I do not, Your Honor. I do not. With regards to the first factor, whether it allowed him to commit a difficult attack wrong, the government points to the success rate, but that's looking at the result, not at the actual act itself. Mr. Douglas was an airline mechanic, an hourly employee. Yes, he did have a security clearance that allowed him direct access to the airport terminals without having to pass through TSA security. However, at that airport as well, there were random bag searches that were conducted, locker searches that were conducted by the airlines. If at any point when Mr. Douglas was transporting the cocaine into the airport, if it was on one of those days when there was a random bag search, it would have been discovered. Why isn't this case like the cases where the prison employee is smuggling in contraband into the facility? Yes. And the theory of those cases, in part, is that the public expects that the guards aren't going to be bringing in contraband and cavorting with the incarcerated. Why isn't an airport like that, a public place, where the public expects that if there's a security clearance given to someone, that they expect that person's not going to use it for nefarious purposes? How do you distinguish those two situations? I believe you're referring to the case that's United States v. Bellwood. That is exactly a prison guard smuggling drugs into a prison facility, and I believe that that falls under the second prong of the three-part test. That is, the degree of authority which the position vests in the defendant vis-à-vis the object of the wrongful act. And the most poignant part of that is the vis-à-vis phrase. So what that means is the individual must have the authority to govern that specific wrongful act. So, for example, a prison guard is tasked with the job of preventing contraband from entering a prison facility. If they are then committing that offense themselves, then they have the authority vis-à-vis that wrongful act, and then they're thwarting that authority. An airport mechanic is not tasked with the job of preventing contraband from entering an airport. Is that offset at all by the fact that he has the same swipe clearance, if you will, that his supervisor or the supervisor's supervisor, Botto, has? I think they both have the same security clearance. Yes. Does that undermine this notion of degree of authority that you've been making? No, I don't believe that. My understanding is it is not uncommon for people not only in Kenneth Douglas' position but in other positions at the airport to have that same level of security clearance. I don't believe that he was elevated to any sort of position. He's not a supervisor or anything like that. Is it in the record whether there's anything special that Douglas had to undergo, any testing, any special oath that was required because of this particular access? No. The only testimony regarding the security level clearance was by Mr. Botto, who testified, and the only thing that I could find within the record that indicated where Mr. Douglas fell on that spectrum was in Mr. Botto's description of how he had arisen from the same position to the position that he currently held with the airline. So it indicated that between Mr. Botto and Mr. Douglas, I think there was three levels that Mr. Botto had been promoted through to his current position. So Mr. Douglas remained at the bottom of the hierarchy. Well, we're going to have five more minutes. Yeah, thank you. May it please the Court. Good morning, Your Honors. My name is Michael Ivory. I'm an Assistant U.S. Attorney from Pittsburgh. I would like to address the issue of the obstruction of justice enhancement in this case. Let me ask you this question. Yes, sir. There are many documents that constitute the medical records that were before the district court. Let's put aside all of them but one, okay? Suppose the only document was the medical authorization for an excuse by, I believe it's Dr. Sheila Anderson, who stated that Mr. Douglas was in the hospital from January 7th until January 8th, and she signs it at 4.12 p.m., which is either at or near the end of the court day. If we had nothing else, why isn't that enough to excuse any notion of willfulness on Douglas' part? Based solely upon that record, it does show that Mr. Douglas was in the hospital that day, and obviously you cannot be in two places at the same time. Anyone who's gone to the emergency room with a minor malady and you end up spending the whole day there, I mean, clearly that's proof to the court that that's caused. You just added something to my hypothetical, which I'd like you not to. I'm sorry. And that is minor malady. Right. I don't want you to think about any of the other records. If you look at that. The court is presented with a document from a doctor. Right. And the document says, Mr. Douglas has been here all day. That's correct. Right. He's been here all day. If that were the only thing. Then you present that to the district court in the cause hearing, and that's the cause that you show why your bond should not be revoked in this case. Yes, and my question is, why doesn't that undermine any notion of willfulness? It shows that his, to the extent willfulness is intentional, and it is, it doesn't show, it shows that his absence was not intentional, but that's not the case in this case. Okay, then let's, and why do you say that? Well, when you look, now, Mr. Bernard's right. We do not have the medical records. We have the medical records. I don't. We never, the government was never. How is that? They were not provided to the government. They were shown to the government. Well, the government must have seen them, because the government commented on them on the record. Absolutely. Obviously, the court commented about them on the record. That's correct. As did defense counsel. Yes, and I was not the prosecutor in this case. I've never seen those records. I only had to go on with what Mr. Lenhart, who was the trial assistant, summarized, as well as what Mr. George, now deceased attorney, said,  Let me place a hypothetical to you. Yes, Your Honor. Suppose the medical records that were presented to the district court included the following. The medical, the doctor's excuse note that I've just mentioned, an evaluation by a medical professional at five different times during a 15-hour period of time, the results of an EKG, which showed a possibility of a first-degree block, a LAFB, and a possible RBBB, all of which are fancy terms for potential heart issues. I'm familiar with that, yes, Your Honor. If those documents also reflected that he was given aspirin in a dosage consistent with being administered to someone who had heart problems, if he was administered insulin, saline fluid, if he was prescribed eight medications by the same medical doctor that excused him from being in court that day, if all of those were presented to the court, wouldn't that be evidence that one was not faking it, as had been alluded to by prior counsel for the government? It would, Your Honor. Again, I've not seen those records, and they were not in our files. And I did look through. None of this was presented as sentencing, which is what we're talking about now. That's correct. That's correct. But it was the government's burden to prove willfulness. That's correct. And we relied on the fact that Bond had been revoked. But how can you do that if Bond was reinstated in four days? Well, I know you're going to say extenuating circumstances. The trial was put off. He felt bad for it. But the bottom line is if he felt so bad and if he thought that he was indeed a risk of flight, why would that happen? The court did find that he was a risk of flight. What happened in jury selection, whenever everyone was there, I believe it was the 14th, is that it became apparent to the government and then was brought to the court's attention that Mr. George was not prepared for trial. There was an in-chambers discussion. I was actually privy to that meeting. There was no court reporter who was present. It was directed to the court's attention that Mr. George – Are you going to tell us stuff that didn't occur on the record that we shouldn't be considering? I can point the court's attention to a document where this information was recounted. It was in the government's response to the defendant's objections to the pre-sentence report. That's document number 2041, and I believe it was filed on January 29, 2015. It's not part of the appendix, but it is part of the record. But that document does reflect that Mr. George was dozing off during jury selection, that at one point he approached Attorney Stephen Begler, who was representing Anthony London, and said to the effect, I didn't know my client was also charged with money laundering in this case. So it was brought to the district court's attention during an in-chambers proceeding. And if you look at page 54 of the government's supplemental appendix, there is a reference to the order of court, which granted the defendant's motion for reconsideration of his bond, as well as getting Mr. George off of the case. And the court specifically referenced that there was an in-chambers discussion. Document number 2041 reflects what transpired during that meeting. If I could just go to something that is in the record that we know you've seen. Yes. And that is, during the course of the show cause hearing where bail was being revoked, the government first says it's possibly faking, and then says it's possible it's a legitimate illness. That's correct. The government bears the burden of proving willfulness. Right. Those statements demonstrate equipoise. They don't carry by preponderance the evidence. How do we reconcile the government's request for an obstruction of justice enhancement when you've got to show willfulness, where the characterization by the government of the evidence it was privy to is an equipoise? Well, ultimately you have the district court's findings saying that Mr. Douglas presented no solid proof that he had a legitimate reason not to be in court. And the interesting thing about the show cause hearing is at no point Mr. Douglas testifies. Because if he had testified, the first question on cross-examination would have been, why didn't you call your attorney and tell him you were not going to be here? Because at two instances during the show cause hearing, Mr. George said, I was shocked. Shocked by the defendant's non-appearance, and I expected him to be here. Let's assume for a moment that he had a conscious thought, you know, I should have called, and he didn't. Your burden of willfulness has to be that he intentionally did not show. And if he's legitimately in the hospital and there are hospital records and representations, I mean, that's why I asked you the first question that I did. Because if there's a representation by Dr. Anderson that he's been legitimately in the hospital for over 12 hours and he's been treated, and by the way, the same doctor who prescribed like eight medications for him at that time, how come that doesn't throw willfulness out of the window? Again, I'm hamstrung by the fact that I've never seen those medical records. I am relying upon what was summarized both by defense counsel, by the government's attorney, which indicated that he had received So you concede then, at the very least, we should vacate and remand? I would like to see those medical records. I really would. And again, your honors, I did look through the various files associated with this case. There were numerous defendants. I was kind of hoping that maybe there was a misfiling or something, but we never got, we were shown the records, we were never provided with those records as far as I can tell. There's no indication on the record that they were ever made court exhibits. I saw no motion made by either attorney, and I didn't see the district court. The district court obviously considered them. Yes, the district court. The district court obviously considered them. It was a district court file and a district court reference. Right, and the district court said on the record that they did not provide solid proof that would excuse the defendant's excuse, and that was clear and convincing evidence to find that he was at risk of flight. Clear and convincing evidence is a standard higher than a preponderance of the evidence, so that could support an intentional finding. So you would concede then that in reviewing the records, we saw that there was a legitimate basis for Mr. Douglas being at the hospital, that that would satisfy clear error in reviewing the district court's determination as you've said it made? Well, it certainly would warrant reconsideration, re-evaluation of those records in connection with the government's assertion that there was an intentional obstruction of justice by his non-appearance. Judge Schwartz just pointed out you didn't make that assertion. Your predecessor didn't make that assertion, right? He could be faking it. He might not be faking it. I've never heard of that kind of equipoise from an assistant, but it's not an office that I'm familiar with, I suppose. That's true. And this all happens at a show cause hearing, which is a considerable time before the sentencing, and there's really nothing presented at the time of sentencing. No, there was the reference in the pre-sentence report. There was an objection made. The government filed its response. I can file a second supplemental appendix including that response if the court would like, but what happened is that they were relying on the fact of non-appearance because non-appearance under the guideline is sufficient to trigger the enhancement. Right, but only if it's not appearance that's willful. Willful. That's correct. That's correct. And my argument is, based upon what I've seen in the record, that certainly it supports a finding of willfulness, that it was intentional, that based upon the district court's finding that the medical records did not provide a solid reason to warrant his excuse. You said they were ambiguous. That's not saying there's no solid evidence. Well, that's what he did say, Your Honor, at page 390 to 391 of the appendix. We do have that finding by the district court, which was stated immediately before he revoked the bond in this case. All right. Let's get to the abuse of position of trust. Judge Schwartz asked about prison employee cases, but prison employee cases go both ways, don't they? They do. They do. Some find that it's a position of trust because you don't have to go through security and you can smuggle drugs into the institution and others don't. How do we reconcile them? Well, again, you have to consider the erratic part of the factors, and I think that when you do, it clearly supports the application of the adjustment in this case. What's the degree of authority that you would ascribe to him? I'm sorry, could you repeat that? I said, what's the degree of authority that you would ascribe to him? He could go anywhere he wanted to in that airport, and he also had the ability, as he told Taiwan Staples, who also worked at the same airport as a mechanic and who could not go everywhere in that airport, which is why they needed Douglas, that he had a way to bypass security. Does that mean that we should establish a rule that if a janitor were in the same position and had a swipe card that they would satisfy the position of trust?  Which is, would the position enable a defendant committed to difficult to detect harm? If your janitor is able to go anywhere in the airport and he's able to bring cocaine, which is a very difficult thing to do, into an airport or contraband, then the first factor is satisfied. What is the degree of authority which vests the defendant with the position vis-à-vis the wrongful act? Clearly, under that scenario, if your janitor is able to... Let's take a step back. Yes, sir. That is not what the enhancement was passed by the floor, right? I mean, it wasn't to see whether a particular person had a swipe card, and if you have a swipe card, then you satisfy the degree of authority. Well, the purpose is to punish insiders who take advantage of a position of trust and commit a difficult to detect harm. Do you think it matters that the events took place at an airport as opposed to an office building? Well, you make a very good point because everybody flies. Airports are security points. They're targets. They're used by the public. I mean, anyone in this country and this courtroom can fly. So I think that there is a certain expectation that there should be... You should be able to trust the employees of an airport not to engage in criminal activity. Do you think we would be less concerned about this enhancement if it was a bomb that was smuggled into the airport by the mechanic? I think we would be very concerned about a mechanic smuggling a bomb. I mean, a kilogram of cocaine can look like a kilogram of C2 and vice versa. You know, Mr. Douglas was relying on Mr. Staple's word that he was smuggling cocaine into the airport when it could have been any type of contraband. So, you know, I think when you look at the fact that during this time period, the conspiracy had a 100% success rate. Not a single seizure of cocaine occurred, and we are talking about hundreds of kilograms of cocaine for almost a year period that Mr. Douglas was able to smuggle through security into the airport to give to a courier and then it was able to come here to the Western District of Pennsylvania ultimately. What's the third factor under PARDA? The third factor is reliance on the defendant's integrity. You know, I think that implicit with the position in this case, considering that unlike other mechanics at the airport, Taiwan Staples, who was the cocaine supplier, did not have the ability to access, unfettered access to the terminal, that there was a reliance by American Airlines or the airport operational authority that Mr. Douglas had a certain degree of integrity. He was at the same level of his supervisor. And there's no getting around that fact that there was certainly a repose in Mr. Douglas' trustworthiness based upon this record. Again, he was able to, the success rate is, was outstanding, phenomenal, and it was because Mr. Douglas had this ability to be able to abuse his trust. Sorry, did the district court ever make a determination that he occupied a position of trust? What findings did he make? I'm sorry? I said what findings did he make? It issued a definitive finding saying that he had considered the objections, the pre-sentence report, and found that the defendant's objections were not meritless. So you're conceding that he made no findings? There was no specific factual finding as to it. And you would agree that under PARDA there has to be some specific findings made on the record? I think that there has to be, that the finding has to be supported by a preponderance of the evidence, and I think that it is in this case. What findings have to be supported by a preponderance? Well, if he made no findings, what are we supposed to look at to jump to preponderance of the evidence? Well, the government did not introduce any evidence at the sentencing hearing, instead relying on the records developed, and I think that that's what the district court did in this case. So you're saying that even though we can't look to specific findings that we can read in a transcript, your position is that the evidence supports the application of the Enhancement Action Commission. That's correct. The absence of specific findings should be overlooked? That's correct. Yes, Your Honor. And you think that's consistent with our law? I believe it is in simpatico with the law, yes, Your Honor. I mean, I understand that in certain circumstances the court does require specific findings with respect to sentencing issues. For example, if the obstruction of justice enhancement in this case was based upon perjurious testimony by a defendant, this court, the Supreme Court, rightfully requires specific findings of perjury. You don't think that Dunnigan only applies to perjury, do you? As I read it, yes. So Dunnigan and – oh, I forget their name. This court's decision interpreting it. I'm having a – No worries. Yes, yes. How many few bars? This is a case out of the Western District based upon perjurious testimony. But it does discuss Dunnigan. I think it came out in 2014. I just can't remember the name of the case. But I don't think that – well, obviously we're not relying on perjury in this case. But my position is that the proponents of the evidence established that there was an abusive position of trust under Craddick and under Pardo. Okay, thanks so much. Thank you, Your Honors. I take it you disagree with your adversary's point that we can proceed without specific findings by the court on the Pardo factors. I do, respectfully, of course. I do want to clear up a couple of points made by Mr. Ivory. First of all, he referenced Co-Defendant Taiwan Staples also being a mechanic but not having the same level of access as Mr. Douglas. If you look closely at the transcript of Mr. Staples' testimony, while they were both mechanics, they both worked in different areas of the airport. Mr. Staples worked in the international hangar, and his duty was to perform more major repairs on aircraft that were grounded for longer periods of time. Mr. Douglas worked at the domestic hangars, and his job was to make minor mechanical repairs to airplanes as they landed. If you were to reveal on both of these enhancements, what would the advisory guideline range fall to? I don't have those numbers right in front of me, Your Honor. It would go down from life. It would go down from life. So would it be the 360 life or the range below that? I believe it would be the one below that. Mr. Douglas was a 44 on the scale, and he was a criminal history category of 1. So without those four points, he would be a 40. All right. He'd be a what? He would be a 40. And he's a 2? He's a 1. He has no prior criminal history whatsoever. So that's 292 to 365. Yes, yes. All right. He received a 240-month sentence. That's correct. He did still receive a downward variance, you know, either way. And why wasn't that reasonable, the 240-month sentence under these circumstances, considering the amount of drugs, the position he used to facilitate the success of this conspiracy, the judge had in front of him the testimony of the wife, considered his prior law-abidingness, and his age, had all that information. How can we find that sentence would have been that 240-month sentence is substantively unreasonable? Well, it's unreasonable and disparate in comparison to the other co-defendants who shared equal roles with Mr. Douglas. But doesn't our case in Parker say that it's unnecessary for a district court to consider comparisons among co-defendants because that guideline on disparity talks about the national disparities? Yes. Yes, that is true, and I can't reconcile that here today. But it also does say that the court can consider preventing disparities among co-defendants in the same case. I thought your position was that we can't get to substantive unreasonableness until these other two are resolved. And if they are resolved in a manner that the government would be against, that is, either reversal or vacateur, then we can't make a judgment on whether it's substantive. That's correct, Your Honor. Even notwithstanding the substantial downward variance that Mr. Douglas received from the guidelines, because procedural error occurred in this case, it must be vacated and remanded for resentencing. Now, he may very well get the same sentence as was imposed here, but nonetheless it still must go back for consideration and determination as to whether these factors were properly applied. I'd also like to address briefly the obstruction of justice enhancement. I think it's been pretty clear here. I apologize for not having been aware of those medical records. Mr. Ivory and myself were both sort of caught off guard by their existence and the fact that this court has those available to them. But I will admit I am happy that you do. But as this court pointed out, it all comes down to willfulness and whether it was an intentional failure to appear. And the Batista case that this court pointed to certainly stands for that proposition. What is different about Batista in this case here is that in Batista it was clear that the defendant was feigning a mental illness. There were five mental health evaluations, and four out of five doctors agreed that he was faking. Here it's not anywhere near as clear-cut. Well, I mean there's no objective evidence in the medical records that he was faking it. Right. Because the Batista evidence is that the medical doctors supported the notion that he was faking it. Correct. So if Douglas was turned away at the door and told, come on, you're fine, that would be one thing. But that's not what happened. Right. Particularly I would think you'd be relying on the fact that he was transferred from one facility to another facility for closer. Indeed, yes. Investigation as to what the problem was. Yes. And, you know, again, it all comes down to the willfulness in it being intentional, as well as the burden of proof being on the government, and they haven't proven by a preponderance that it was intentional. And I know I'm out of time, but just one more thing I want to just reference here. Well, how would you do that if you were out of time? Well, if this court would permit me to just make one more quick reference, I believe the question was regarding whether or not a janitor should be held to hold a position of trust, simply by virtue of having access to different areas of the airport. And I included in my brief the case of the United States v. Corey out of the First Circuit. It deals directly with that issue, as well as the Perea Roman case out of the First Circuit. Those hinged on the professional managerial discretion aspect, and I don't believe that this court has abandoned that factor, which is the first factor outlined in the sentencing guidelines. I just believe that the professional or the managerial discretion aspect has been embodied in that second part O factor. All right. Thank you very much. Thank you. Good argument, counsel, and we'll take it under advisement.